IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| KRISSY SANCHEZ,<br><br>        Plaintiff,<br><br>    vs.<br><br>CIERRA RASH, et al.,<br><br>        Defendants. | Cause No. CV 17-156-BLG-SPW-TJC<br><br><br>FINDINGS<br>AND RECOMMENDATION<br>OF U.S. MAGISTRATE JUDGE |

Plaintiff Krissy Sanchez filed this action in November 2017, challenging defendants' actions in connection with the care and custody of her children. Between April 3, 2020, and May 20, 2020, all Defendants filed motions for summary judgment. Sanchez did not respond to any of them.

On September 16, 2020, the Court ordered Sanchez to show cause, on or before September 30, why it should not address the pending motions for summary judgment. *See* Order (Doc. 137). On October 5, 2020, Sanchez filed a document titled "Objection to summary judgment & motion to amend and modify requested relief." Pl. Obj. (Doc. 150). The document was not comprehensible, but it did contain the phrase "the court must give the plaintiff time." *See id*. at 1. The Court gave Sanchez another 21 days to respond to the State Defendants' motion for summary judgment. *See* Order (Doc. 155). Again, Sanchez failed to respond.

1

## I. Overview

The case arises from the removal of fifteen-year-old G. and three-year-old A. from Sanchez's parental custody by Montana's Department of Public Health and Human Services ("the Department"). The following facts are not in dispute.

On September 1, 2017, based on information provided by several people—including G., who was living at a boarding school in Bozeman—Defendants Cierra Rash, a social worker, and Chris Friedel, a private contractor providing drug testing services, went to Sanchez's home. Though initially intending to interview Sanchez, Rash decided to remove A. from the home. She called the Yellowstone County Sheriff's Office for assistance. Defendants Cunningham, Lauwers, McCave, and Taylor responded. A. was removed from Sanchez's custody and placed with Sanchez's mother.

Ten days later, on September 11, 2017, the Department initiated legal proceedings to adjudicate A.'s and G.'s need for care. In those proceedings, the state court ruled that A.'s removal on September 1 was appropriate. The state case concluded on May 14, 2018. Both children were returned to Sanchez's custody.

Sanchez alleges the warrantless removal of A. was unlawful because there was no reasonable cause to believe A. was in imminent danger. She also alleges that Yellowstone County unconstitutionally removes children at social workers' demand, and Sheriff Linder failed to train deputies appropriately. And she

challenges decisions made or carried out between September 1, 2017, and May 14, 2018, by certain Department employees, Defendants Rash, Ellerbee, Larson, Anthony, Johnson, Hogan, Kirby, Weber, and Fitch (collectively, the "State Defendants"), in the course of the proceedings involving the custody of both A. and G.

As the State Defendants point out, *see* State Defs. Br. (Doc. 141) at 10–11, Sanchez lacks standing to assert violations of G.'s or A.'s constitutional rights. "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Further, Sanchez is not a member of the Bar of this Court and so cannot assert or advocate for the legal rights of her children in this action. *See, e.g.*, D. Mont. L.R. 83.8(a) (Dec. 1, 2019). Therefore, this action involves no claims by or on behalf of A. or G.

In addition, although the Department removed both G. and A. from Sanchez's custody on September 1, 2017, Sanchez does not contest the decision to remove G. *See, e.g.*, Am. Compl. (Doc. 83-1) at 10 (Sanchez reports telling Rash, "Perhaps with these allegations there should be counseling but why would she remove [A.]?"; *id*. at 16 (referring to "unlawful removal of my child," singular, and "illegally seizing [A.]"; *id*. at 17 "[A]. was illegally removed").

With the liberal interpretation the Court must afford to pro se litigants'

pleadings, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012), the Court understands Sanchez to assert violations of her Fourteenth Amendment due process right to the care, custody, and control of her children and her Fourth Amendment right to be free of unreasonable searches and seizures.

## II. *Rooker-Feldman* Doctrine

Pointing to the state court's decision validating the Department's emergency removal of A. from Sanchez's home, the State Defendants assert that the *Rooker-Feldman* doctrine bars Sanchez's attempt to show the removal was invalid. *See* State Defs. Br. (Doc. 141) at 25. If the doctrine applies, the Court lacks subject matter jurisdiction over the claim and can neither grant nor deny summary judgment. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482–86 (1983).

The *Rooker-Feldman* doctrine requires dismissal of *de facto* appeals of state court judgments, which federal district courts have no jurisdiction to hear. Such appeals are insupportable *de jure*, as the United States Supreme Court is the only federal court with appellate jurisdiction over state courts' judgments. *See* 28 U.S.C. §§ 1257(a), 1331. The doctrine, therefore, prevents litigants from taking an appeal by calling it a lawsuit. For three reasons, the doctrine does not apply here.

First, *Rooker-Feldman* applies to "cases brought by state-court losers

complaining of injuries caused by state-court *judgments* rendered *before* the [federal] district court proceedings commenced and inviting [federal] district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus., Inc.*, 544 U.S. 280, 284 (2005) (emphasis added). The Supreme Court holds that *Rooker-Feldman* does not apply to federal actions commenced while state court actions are pending, even if the state court enters judgment before the federal action is resolved. *See id*. at 292. Sanchez filed this case on November 27, 2017, about six months before the state court dismissed the Department's petition.

Second, Sanchez does not sue the state court, *see Feldman*, 460 U.S. at 468, 472, "does not directly challenge [the] state court's factual or legal conclusion," *Manufactured Home Communities Inc. v. City of San Jose*, 420 F.3d 1022, 1030 (9th Cir. 2005), and does not ask this Court to declare the state court's decision "null and void," *see Rooker*, 263 U.S. at 414. The amended complaint frequently refers to the State Defendants' statements about the state court or their failure to comply with the state court's orders. But only once does Sanchez even tacitly acknowledge that she seeks in this Court a decision that would differ from a decision made by the state court. She says various defendants misrepresented facts to the state court in the *ex parte* hearing. *See* Am. Compl. at 27. "If a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party,'"

5

*Rooker-Feldman* does not apply. *Exxon Mobil Corp.*, 544 U.S. at 293 (quoting *GASH Assocs.*, 995 F.2d at 728, and citing *Noel*, 341 F.3d at 1163–64) (brackets in *Exxon Mobil*).

Third, the doctrine applies only if the plaintiff complains of an injury *caused by* an allegedly erroneous judgment of a state court, not if she complains of an injury caused by an adverse party. *See Noel v. Hall*, 341 F.3d 1148, 1163–65 (9th Cir. 2003) (discussing *GASH Assocs. v. Village of Rosemont*, 995 F.2d 726, 728–29 (7th Cir. 1993)). As *Noel* explains, "[i]t is a forbidden de facto appeal under *Rooker-Feldman* when the plaintiff in federal district court complains of a legal wrong allegedly committed by the state court, and seeks relief from the judgment of that court." *Id.* at 1163. A *de facto* appeal may arise in two kinds of cases. In one, the federal plaintiff complains of "harm caused by a state court judgment that directly withholds a benefit from (or imposes a detriment on) the federal plaintiff, based on an allegedly erroneous ruling by that court." *Noel*, 341 F.3d at 1163. In the other, the federal plaintiff complains of "a legal injury caused by a state court judgment, based on an allegedly erroneous legal ruling, in a case in which the federal plaintiff was one of the litigants." *Id*.

Sanchez makes neither sort of complaint. She does not claim the state court's judgment *caused* her injuries. She claims the Defendants caused her injuries. The state court's final judgment favored her. And she was not "one of

the litigants" when the Department obtained the interlocutory order the State

Defendants rely on.  The proceeding was *ex parte*.  In sum, Sanchez claims she

suffered an injury out of court and did not obtain relief from the state court.  *See*

*Noel*, 341 F.3d at 1164–65 (quoting *GASH Assocs.*, 995 F.2d at 728–29).

      *Rooker-Feldman* applies when a federal district court is asked to act upon a

state court's judgment by vacating it, declaring it void, or otherwise altering its

legal status, as only an appellate court could.  When, as here, a federal district court

is asked to decide some of the same legal or factual questions, the Full Faith and

Credit Act and principles of preclusion may apply, but *Rooker-Feldman* does not.

*See* 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 94–97 (1980); *see also*

*Exxon Mobil Corp.*, 544 U.S. at 293.  Sanchez's lawsuit is not a *de facto* appeal

and does not run afoul of the *Rooker-Feldman* doctrine.  The Court may consider

all motions for summary judgment.

### III.  Motions for Summary Judgment

### A.  Applicable Standards

      A court will grant summary judgment if the movant can show "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the

outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute as to a material fact is genuine if there is sufficient evidence for a

reasonable fact-finder to return a verdict for the nonmoving party. *Id.*

The moving party has the initial burden to submit evidence demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets its initial responsibility, the burden shifts to the nonmoving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[A] proper summary judgment motion [may] be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex*, 477 U.S. at 324. Rule 56(c) lists "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

On May 13, 2020, the State Defendants filed a notice and warning to Sanchez pursuant to Local Rule 56.3. *See* Notice and Warning (Doc. 117); D. Mont. L.R. 56.2(a). They were not required to do so, as Sanchez is not a prisoner. But Sanchez was specifically advised she could not rest on her pleadings and must submit evidence to show a genuine issue of material fact.

### B. Qualified Immunity

Among other issues, all Defendants except Sheriff Linder and Yellowstone County raise and brief the defense of qualified immunity. "Qualified immunity

balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In other words, public officials are not personally liable for making mistakes or misjudgments so long as their actions are reasonable in light of clearly established law.

Qualified immunity shields federal and state officials from civil liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016). The court has discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first. *See Pearson*, 555 U.S. at 236.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (citing *Reichle v. Howards*, __ U.S. __, 132 S. Ct. 2088, 2093 (2012)). The Supreme Court has cautioned that

9

clearly established law should not be defined at a high level of generality.  *See id.*

at 12.  The inquiry "must be undertaken in light of the specific context of the case,

not as a broad general proposition."  *Id.* (internal citations omitted).  It is not

necessary to find a case directly on point, "in which the very action in question has

been held unlawful," but "in the light of pre-existing law the unlawfulness must be

apparent."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In other words,

"existing precedent must have placed the statutory or constitutional question

beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "Put simply,

qualified immunity protects 'all but the plainly incompetent or those who

knowingly violate the law.'"  *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341

(1986)).

"[T]he 'clearly established' prong of the qualified immunity analysis is a

matter of law to be decided by a judge."  *Reese v. County of Sacramento*, 888 F.3d

1030, 1037 (9th Cir. 2018).  The plaintiff bears the burden of proving the existence

of a clearly established right at the time of the alleged misconduct.  *See Davis v.*

*Scherer*, 468 U.S. 183, 197 (1984); *Olivier v. Baca*, 913 F.3d 852, 860 (9th Cir.

2019); *Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir. 1992).

The Court will address the second prong of qualified immunity for all events

through A.'s removal on September 1, 2017, since it is determinative of Sanchez's

claims.  The relevant inquiry with respect to those events is whether existing

10

precedent placed the conclusion that Defendants violated Sanchez's constitutional

rights "beyond debate." *Mullenix*, 577 U.S. at 13-14.

### 1. G.'s Interview

Sanchez alleges that Defendant Kirby interviewed G. at her boarding school

without parental consent. *See* Am. Compl. at 44 (lines 8–10).[1]  "[A] cause of

action [may] lie where the social worker is accused of seizing a child and the

parent has . . . 'actually lost' control over the child."[2]  *Dees v. County of San*

*Diego*, 960 F.3d 1145, 1153 (9th Cir. 2020) (describing holding of *Capp v. County*

*of San Diego*, 940 F.3d 1046, 1060 (9th Cir. 2019)).  Based in part on G.'s

interview, Sanchez temporarily lost custody of her.  *See* Pet. for Emergency

Protective Services (Doc. 147-3) at 6.  Therefore, this claim turns on whether

Kirby "seized" G.

G. was 15 years old at the time of the interview.  The video recording does

not indicate whether she was told she must talk to Kirby or was free or not free to

leave.  But the interview was conducted at G.'s school in an area that looks like a

living room, with Kirby and G. seated in cushioned chair and couch several feet

---

[1] Sanchez's amended complaint defines the issues she presents but is unverified.  *See, e.g.*, *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1022 (9th Cir. 2010); *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc); Fed. R. Civ. P. 11(a), (b)(3), 56(c)(4); 28 U.S.C. § 1746.

[2] The full quotation is phrased in the negative:  "[A] cause of action does not lie where the social worker is accused of seizing a child and the parent has not 'actually lost' control over the child."  *Dees*, 960 F.3d at 1153.

away from each other.  Only those two individuals were present.  Kirby spoke in a quiet voice, explained her purpose, and made no promises to G. about what would or would not happen as a result of her statements.  Rather than pressing or even encouraging G. to speak, Kirby asked one question at a time and allowed G. time to answer.  She approached G. only to offer tissues.  The interview lasted for about an hour.  G. appeared upset at times by the information she was relaying, but not by the circumstances of the interview.  She did not appear fatigued or reluctant to talk.  There is no hint of coercion or restraint.

The evidence suggests G. spoke freely and was not coerced in any way. Sanchez has produced no evidence supporting an inference that G. was not free to leave.  As there is no evidence that G. was seized, Sanchez cannot show Kirby violated a clearly established constitutional right.  Kirby is entitled to summary judgment on this claim.

### 2. A.'s Removal on September 1, 2017

For the following reasons, the Court finds that Defendants did not violate Sanchez's clearly established constitutional rights during the events on September 1, 2017.

### (a)  Decision to Remove A. Without a Warrant or Order

### (i)  Allegations of the Amended Complaint

Sanchez alleges that Defendant Rash did not have reasonable cause to

believe A. was in "imminent danger" sufficient to justify his removal without a court order.  *See* Am. Compl. (Doc. 83-1) at 10–11; *see also* Mont. Code Ann. § 41-3-301(1).

### (ii)  Relevant Evidence

The evidence shows that Sanchez first came to the Department's attention in April 2010, when G. would have been about eight years old.  In December 2016, while G. was hospitalized due to suicidal ideation, Sanchez's then-partner physically assaulted Sanchez while A. was in the home.  The Department took no action, as Sanchez reported she had moved to Nevada, intended to seek a divorce, and had obtained services for G.  *See* Rash Decl. (Doc. 147) at 2–3 ¶¶ 4–5.

Between August 16 and 27, 2017, however, the Department received eight calls to its child abuse or neglect hotline.  These reports indicated that, at various times within the past year, Sanchez physically beat, choked, and kicked G.; emotionally abused, manipulated, and isolated her; took G.'s and others' prescription medications to use them herself or sell them; made G. drink alcohol and smoke marijuana with her; and once threatened to kill herself while holding a gun to her head.  G., who was attending a boarding school in Bozeman, had received treatment for anxiety, depression, medical issues, and cutting herself.  Sanchez was reported to have left Florida ten or eleven years previously to avoid accusations of child abuse and neglect.  She also reportedly had significant mental

health issues and a history of alcohol and methamphetamine use.  G. and A. were said to be afraid of Sanchez, and G. was said to be concerned about A., because she had been his principal caretaker before she went to Bozeman.  G. also said that Sanchez hit A.  G. had engaged in self-cutting and had anxiety and other health issues.  At least two people, including G., said that Sanchez kept A. locked in his room all day.  One caller observed that Sanchez's mental health appeared to be deteriorating, and more than one caller expressed fear that Sanchez would flee or retaliate if she learned anyone had reported her.  *See* Rash Decl. at 3–7 ¶¶ 7–13, 8 ¶¶ 16–17.

As discussed above, Defendant Kirby interviewed G. in person.  G. described incidents of physical and emotional abuse by Sanchez, including one occasion when Sanchez choked her, threw her down and pinned her to the ground, spat in her face, and threatened to kill her.  G. said Sanchez made her keep A. locked in his room all day and blockade the door if he tried to get out.  G. also said there was black mold and black widow spiders in the house and there was no potable water and no hot water.  Bozeman law enforcement officers also interviewed G., with Kirby sitting in.  G. reported, among the other matters she had disclosed to Kirby, that Sanchez spanked A.'s rear end and smacked him in the face before he was three years old.  *See* Rash Decl. at 9–10 ¶¶ 18–19; *see also* Notice of Conventional Filing (Doc. 149) (Kirby Decl. (Doc. 144-1)).

14

Rash also interviewed in person an adult whom Sanchez fostered as a child and who had recently lived in Sanchez's home. That person confirmed that Sanchez spanked A. "on the butt with an open hand." On August 30, the person saw Sanchez use Suboxone prescribed to someone else. The person also confirmed the presence of black mold in the home. *See* Rash Decl. at 10–11 ¶ 20.

Rash decided to interview Sanchez. Given the reports of Sanchez's illicit drug use, she asked Chris Friedel, an employee of a private drug testing company, to accompany her to Sanchez's home and administer a field test. *See id.* at 11 ¶ 21.

When she arrived at Sanchez's home, Rash noticed three surveillance cameras in the front windows. *See* Rash Decl. at 11 ¶ 22. Rash knocked several times. Sanchez eventually allowed Rash to enter. Rash saw A., "who was mostly pre-verbal." *Id.* Sanchez showed Rash black mold and said the landlord was going to fix it. She also declined drug testing. *See id.* She said she understood why the Department would want to remove G., given her allegations, but argued that A. was not in imminent danger. Rash told Sanchez that, "based on the physical abuse allegations, as well as the black mold and refusal to take an onsite drug test," she was going to place A. in emergency protective custody. Sanchez "became very verbally aggressive," but Rash and Sanchez agreed to place A. with Sanchez's mother. Sanchez added the proviso that placement would not be acceptable if her mother had "reported on" her. Rash and Sanchez called

Sanchez's mother, who agreed to care for A. and G. *See id*. at 11 ¶ 23.

Sanchez began "angrily gathering [A.'s] belongings." Rash Decl. at 12 ¶ 24. Rash exited the house, assuming Sanchez would follow with A. Instead, Sanchez shut and locked the door behind Rash and refused to reopen it. She told Rash she would have to get law enforcement assistance. Rash did so. *See id*.

When officers arrived, they discovered Sanchez and A. had left the house. Sanchez was later stopped as she was walking alongside the road with A., and Rash took A. into her custody.

### (iii)  Analysis

These facts implicate Sanchez's Fourteenth and First Amendment rights to parent her children. A parent's interest in the "care, custody, and control" of a child "is perhaps the oldest of the fundamental liberty interests recognized" under the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (citing, *inter alia*, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 299 (1923)). The First Amendment, too, protects "family relationships." *See Board v. Directors v. Rotary Club*, 481 U.S. 537, 545 (1987); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618–19 (citing, *inter alia*, *Yoder*, *Pierce*, and *Meyer*).

A governmental officer or employee "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first

pursued." *Keates v. Koile*, 883 F.3d 1228, 1237 (9th Cir. 2018) (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000)).  And a child cannot be removed from a parent's custody without a court order "unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue." *Keates*, 883 F.3d at 1237–38; *see also Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294–95 (9th Cir. 2007); *Wallis*, 202 F.3d 1126, 1138 (9th Cir. 2000).[3]  "For information to amount to probable cause,[4] it does not have to be conclusive of guilt, and it does not have to exclude the possibility of innocence." *Garcia v. County of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011).  "All that is required is a fair probability, given the totality of the evidence," *id.*, that a child is in imminent danger of incurring serious bodily injury "in the time that would be

---

[3]  Montana law permitted A.'s removal without a warrant if Rash had "reason to believe [he was] in immediate or apparent danger of harm." Mont. Code Ann. § 41-3-301(1).  "Harm" appears to be a significantly more capacious term than "serious bodily injury."  Montana defines "child abuse or neglect" as "actual physical or psychological harm to a child," "substantial risk of physical or psychological harm to a child," or abandonment.  It includes "exposing a child to the criminal distribution of dangerous drugs." Mont. Code Ann. § 41-3-102(7)(a), (b)(i)(B) (2019).  "Physical abuse" includes intentional or grossly negligent acts or omissions resulting in "substantial skin bruising, internal bleeding, substantial injury to skin, subdural hematoma, burns, bone fractures, extreme pain, permanent or temporary disfigurement, impairment of any bodily organ or function, or death." *Id*. § 41-3-102(19).  "Physical abuse" appears to exclude acts intended to cause transient physical pain and/or humiliation, such as the practice of spanking.

[4]  Reasonable cause may arguably be a somewhat lower standard than probable cause. The probable cause standard is applied here.

17

required to obtain a warrant," *Rogers*, 487 F.3d at 1294.

Rash noted that A. seemed to be "pre-verbal" at the age of three years and about nine months, and G. reported that Sanchez had hit him in the face before he was three years old. Still, Rash did not find A. locked in a room when she arrived, she did not see any markers of physical abuse on A.'s body, nor did she observe that he appeared to be afraid of Sanchez. Although Rash had ample evidence that Sanchez physically abused G., she had little evidence that Sanchez physically abused A.

Nevertheless, Rash had received reports that Sanchez previously fled an investigation—conduct which could support an inference that Sanchez believed evidence of abuse would be found and used against her. Then she witnessed Sanchez's abrupt disengagement with her and flight from the home, just after she had refused to undergo a drug test. Rash also witnessed impetuous and temperamental behavior by Sanchez, who at one moment agreed to put A. in her mother's custody and began to collect his things, and in the next moment cut off contact with Rash. This conduct could reasonably be viewed as consistent with the hotline reports of Sanchez's worsening mental health issues and the interviews indicating she recently abused prescription drugs. Indications that Sanchez was not exercising self-control could reasonably cast A.'s apparently "pre-verbal" development and G.'s report of his physical abuse, as well as A.'s natural physical

vulnerability as a three-year-old child unable to protect himself, in a different and more emergent light.  In addition, Sanchez's erratic behavior and her actions taking A. and leaving the scene also made it very difficult to justify delaying matters long enough to obtain a court order.

Under these circumstances, it cannot be found that Rash violated a clearly established constitutional right.  Sanchez has offered no authority, and the Court is aware of none, which squarely governs these circumstances and clearly establishes the violative nature of Rash's conduct in the situation she confronted.  A reasonable official under these circumstances could have reasonably concluded that there was probable cause to find that A. was in imminent danger of serious bodily injury, and Sanchez's flight made obtaining a warrant in timely manner all but impossible.

### (b)  Initial Encounter Among Sanchez, Rash, and Friedel

### (i)  Allegations of the Amended Complaint

In the amended complaint, Sanchez alleges that Defendants Rash and Friedel violated the Fourth Amendment on September 1, 2017, at Sanchez's home. Sanchez invited Rash into her home and they discussed her children's situation. *See* Am. Compl. (Doc. 83-1) at 6–10.  Sanchez allowed Rash to take one photograph but Rash took two.  *See id*. at 10 para. 1.  Rash went outside, reentered the home with Friedel, and told Sanchez she must submit to a drug test with

19

Friedel.  *See* Am. Compl. at 11 para. 3.  Sanchez refused to test with Friedel and told him to leave.  Friedel did not leave and stood in front of the door, preventing Sanchez from leaving.  *See id*. at 12 paras. 1–2.

Sanchez again asked Rash and Friedel to leave and began gathering some items for A.'s activities for the day.  Rash and Friedel went outside and stood by Sanchez's vehicle.  Sanchez told them she was locking up because she had things to do.  She went back into the house.  Sanchez and A. departed by the back door. *See id*. at 12 ¶¶ 3–4.

These allegations implicate Sanchez's Fourth Amendment right to be free of unreasonable intrusions into her home—Rash at her second entry, Friedel at his first—and unreasonable seizure of her person when she was prevented from leaving.  *See* Am. Compl. at 14–15.

### (ii)  Relevant Evidence

The evidence shows that Sanchez invited Rash into the home.  *See* Rash Decl. (Doc. 147) at 11 ¶ 22; Friedel Decl. (Doc. 111-1) at 2 ¶ 9; *see also, e.g.*, Am. Compl. at 7 para. 2.  Rash does not address the question, but Friedel avers that Rash invited him into the home, as he believed, with Sanchez's consent.  He also avers that he did not prevent Sanchez from leaving.  *See* Friedel Decl. at 2 ¶ 9, 3 ¶ 14.  There is no evidence that Rash left the home and reentered it, with or without permission.  There is no evidence (and no allegation) that either Rash or Friedel

20

opened drawers or closets or ventured into areas of the house outside of Sanchez's
vision and invitation.  In sum, all available evidence indicates that entry to the
home was limited to the scope of Sanchez's consent.

### (iii)  Analysis

"[O]fficers may seize evidence in plain view, provided that they have not
violated the Fourth Amendment in arriving at the spot from which the observation
of the evidence is made." *Kentucky v. King*, 563 U.S. 452, 463 (2011) (citing
*Horton v. California*, 496 U.S. 128, 136–40 (1990)).  And "officers may seek
consent-based encounters if they are lawfully present in the place where the
consensual encounter occurs." *Id*. (citing *INS v. Delgado*, 466 U.S. 210, 217–19 &
n.5 (1984)).  Although Rash asked Sanchez to submit to a drug test, Sanchez
refused, so none was administered.  No other search or seizure occurred.  If Rash
photographed something—and no supporting evidence has been introduced—she
could only photograph what was in plain view.

In short, the undisputed evidence shows that Rash and Friedel did not violate
a clearly established right under the Fourth Amendment.  A reasonable officer
could have believed that Sanchez consented to their entry, and there is no evidence
to indicate that either Defendant exceeded the scope of that consent or engaged in
an unlawful search.

All claims arising from the initial encounter between Sanchez and Rash and

Friedel should be denied.  As this encounter supports the only claim against Defendant Friedel, he is entitled to summary judgment.

### (c)  Subsequent Search and Removal of A.

#### (i)  Allegations of the Amended Complaint

In the amended complaint, Sanchez alleges that, after she left her home, Yellowstone County deputies arrived and, according to someone who phoned Sanchez, entered her home.  *See* Am. Compl. at 12–13.  Sanchez, with A., began their return walk home along the side of the road.  On the way, they encountered Deputy McCave, who stopped his car and told her she was being detained because social services was going to remove A. from Sanchez's care.  Sanchez told McCave no one could remove A. without a court order or warrant.  McCave responded that he was acting at the direction of social services.  *See id*. at 13 paras. 2–3.  At some point, Sanchez heard the deputies ridiculing her over the radio.  *See id*. at 16 para. 3.

Rash and Deputies Lauwers, Taylor, and Cunningham arrived.  Rash took A. into her custody.  *See* Am. Compl. at 14 paras. 2–4.

Lauwers drove Sanchez to her house to retrieve A.'s blanket.  He told her the house "was a mess" because "they had kicked in her doors and searched the place because kids can hide anywhere."  Sanchez discovered that personal photographs were taken from the house and A.'s car seat had been taken from her

22

vehicle.  She alleges that Rash took these items.  *See id*. at 14 para. 5, 16 para. 4.

Sanchez alleges Rash told the deputies that Sanchez "could have left out the back,"

but the deputies entered the house to search for A. anyway.  *See id.* at 16 para. 3.

Sanchez's claim that Rash unlawfully removed A. was addressed above.

Here, the manner of the removal is addressed.  These allegations implicate

Sanchez's Fourth Amendment right to be free of unreasonable searches and

seizures.  Sanchez claims that the deputies relied on Rash's words "without

verifying facts or appropriateness" of removing A.; that the deputies unlawfully

entered, searched, and photographed Sanchez's home; that Rash, with the deputies'

acquiescence, unlawfully took personal photographs and the car seat; and that the

deputies and Rash unlawfully seized Sanchez when they temporarily detained her

to take custody of A.  *See* Am. Compl. at 14–15.

### (ii)  Relevant Evidence

The evidence shows that, before Rash exited Sanchez's house, she and

Sanchez agreed that A. could be placed with Sanchez's mother.  *See* Rash Decl.

(Doc. 147) at 12 ¶ 24.  When Rash exited the house, she believed Sanchez would

follow with A.  *See id*.  Instead, Sanchez closed and locked the door and told Rash

she "would need to get law enforcement."  *Id*.  Rash called the Yellowstone

County Sheriff's Office for assistance.  *See id*.

Deputy McCave, Deputy Lauwers, and Lieutenant Cunningham all

23

responded to Sanchez's home.  Deputy Lauwers knocked at all the accessible doors and windows but received no response.  *See* McCave Aff. (Doc. 124) at 2 ¶¶ 2–6; Lauwers Aff. (Doc. 122) at 2–3 ¶¶ 2–6; Cunningham Aff. (Doc. 123) at 2 ¶ 2.

One of the deputies asked Rash whether she had "any concerns about [Sanchez] fleeing the scene."  Rash responded that she had unconfirmed reports Sanchez had fled, with her children, from a child abuse and neglect investigation in another state.  *See* Rash Decl. at 12–13 ¶ 24.  Lieutenant Cunningham learned from Rash that Child Protective Services[5] in Billings and Bozeman were jointly investigating allegations, made by G. and her grandparents, that Sanchez physically abused G. and A.  He also learned that G. said that Sanchez used illegal drugs.  Cunningham contacted Undersheriff Evans, who gave permission to force entry.  *See* Cunningham Aff. (Doc. 123) at 2–3 ¶¶ 4–6; Lauwers Aff. (Doc. 122) at 2–3 ¶¶ 2–7.

Cunningham and Lauwers kicked in the door and searched the house but found no one inside.  Cunningham believed Sanchez and the child had left the house out the back.  Evans arrived and the three deputies searched the area, finding nothing but fresh footprints on a creek bank behind the home.  Lauwers took photographs inside and outside, secured the entries to the home, and left a card with contact information for the Sheriff's Office.  Cunningham asked dispatchers

---

[5]  Child Protective Services is an agency of the Department.

to "ping" Sanchez's phone and learned it appeared to have been switched off near Huntley, Montana. *See* Cunningham Aff. at 3 ¶¶ 6–9; Lauwers Aff. at 3–4 ¶¶ 7–11.

Rash and the officers discussed whether to issue an Amber Alert and took steps to prepare one. Rash called Sanchez's mother and obtained a photograph of A. *See* Rash Decl. at 13 ¶ 25. Lauwers took a statement from Rash and departed toward the Sheriff's Office. *See* Lauwers Aff. at 4 ¶ 12, 5 ¶ 15.

Shortly thereafter, Sanchez and A. were seen near the Red Rooster Bar in Shepherd, Montana. Deputy Taylor drove toward the location and encountered Sanchez walking along the side of the road. He pulled over in his patrol car, stopping her, and informed her that he was detaining A. on behalf of Child Protective Services. *See* Taylor Aff. (Doc. 126) at 2 ¶ 4; Cunningham Aff. (Doc. 123) at 4 ¶ 10. Cunningham, Lauwers, and Rash arrived at the scene. Sanchez was "verbally defiant." Cunningham Aff. at 4 ¶ 11. Cunningham advised her that she could be arrested for obstruction. Sanchez then permitted Rash to take A. into her custody. Lauwers gave Sanchez a ride back to her home. She did not want to give a statement. *See* Taylor Aff. at 2 ¶¶ 5–7; Lauwers Aff. at 5 ¶¶ 13–15; Cunningham Aff. at 4 ¶¶ 10–13; Rash Decl. at 13 ¶¶ 25–26.

Video footage from the patrol cars of Lieutenant Cunningham and Deputies Lauwers and Taylor visually and audibly corroborates many of the facts related in

these affidavits. *See generally* Notice of Conventional Filing (Doc. 149) (Rash

Decl. Ex. A (Doc. 147-1)).

### (iii) Analysis

To enter and search Sanchez's home without a warrant, the officers had to

have probable cause and exigent circumstances. As noted above, "[f]or

information to amount to probable cause, it does not have to be conclusive of guilt,

and it does not have to exclude the possibility of innocence." *Garcia*, 639 F.3d at

1209. "All that is required is a fair probability, given the totality of the evidence,"

*id.*, to believe that evidence or contraband will be found inside the home.

From the officers' perspective, Rash was a complaining witness. Her

identity was known to the officers, and she could be held legally accountable, even

lose her job, if she knowingly misled or lied to them. *See, e.g.*, *Illinois v. Gates*,

462 U.S. 213, 233–34 (1983) (describing reports from citizens); *Adams v.

Williams*, 407 U.S. 143, 146–47 (1972) (describing an informant tip). They were

not required to obtain independent evidence corroborating Rash's statements

before they acted.

Rash provided the officers reason to believe that Child Protective Services

was investigating allegations of physical abuse and drug use by Sanchez; reason to

believe Sanchez had evaded her; and reason to believe Sanchez had fled an

investigation by another State. The officers also knew that Sanchez had not

responded to their presence outside her home even though her last known location was inside the home.  At that point, a reasonable officer could have concluded that they had probable cause to believe both that A. was in danger while he remained in Sanchez's custody, and that he was reasonably likely to be inside the house.  A reasonable officer could have also believed they had exigent circumstances to enter without a warrant on the basis there was a fair probability that a three-year-old child was in danger, and it would have been unreasonable to take the time to apply for and obtain a warrant.  Sanchez has offered no authority which squarely governs the situation presented, and the Court is aware of none which would have put the officers on notice that their conduct in entering the house and searching for A. violated the Constitution in the situation they confronted.

To stop Sanchez for the purpose of taking custody of A., the officers had to have reasonable suspicion that A. was in her custody, and the scope of their intrusion on her freedom had to be reasonable.  *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  A. was visibly in Sanchez's custody.  Deputy Taylor reasonably stopped Sanchez and detained her until Rash arrived.  The other officers reasonably facilitated A.'s transfer of custody from Sanchez to Rash.  The stop was not unduly prolonged, and Sanchez suffered no intrusion beyond the stop itself. The officers did not violate a clearly established constitutional right.  They are entitled to summary judgment on this aspect of the claim.

As to Rash, there is no evidence that she took personal photographs belonging to Sanchez.  There is evidence that she took a car seat from a car parked on Sanchez's property.  *See* Lauwers Video 1 VTS_05_1.VOB at 03:15–04:00; Notice of Conventional Filing (Doc. 149) (Rash Decl. Ex. A (Doc. 147-1)).  But there is no evidence the seat was not timely returned to Sanchez.  *See Brewster v. Beck*, 859 F.3d 1194, 1196–97 (9th Cir. 2017).  The Court is aware of no authority which clearly establishes that Rash was violating Sanchez's constitutional rights by utilizing A.'s seat to safely transport the child.  Rash is also entitled to summary judgment on this aspect of the claim.

### (d)  Conclusion: A.'s Removal on September 1, 2017

All claims arising from A.'s removal on September 1, 2017, should be denied.  As these are the only claims against Defendants Friedel, Cunningham, Lauwers, McCave, Taylor, Linder, and Yellowstone County, these defendants are entitled to summary judgment.

### 3.  Events After Removal

Sanchez's remaining allegations are less focused than those previously addressed.  For the following reasons, the Court finds no evidence to support Sanchez's claims that any defendant violated her constitutional rights after September 1, 2017,and therefore, Defendants are entitled to qualified immunity based on the first prong of the qualified immunity analysis.

28

### (a)  A.'s Placement

In the amended complaint, Sanchez asserts that she told Rash or others that placing A. (and possibly G. as well) with Sanchez's mother was unacceptable due to a documented history of sexual abuse in her mother's home.  The Court will assume that a social worker would violate a parent's federal Constitutional right to care for her child by knowingly placing the child with a person whose history includes the perpetration or permission of sexual abuse of children.  But the evidence shows Rash told Sanchez that A. would be placed with Sanchez's mother, Sanchez agreed, and Sanchez's mother's background was adequately investigated.  Sanchez did not complain of A.'s placement until the end of September 2017, after she learned that her mother was one of the people who had made unfavorable reports to Rash.  *See* Rash Decl. (Doc. 147) at 12 ¶ 23, 13–16 ¶¶ 26–40, 16–17 ¶ 42; Larson Decl. (Doc. 145) at 2 ¶ 2; Poe Decl. (Doc. 146) at 2–3 ¶¶ 2–6; *see also* Cunningham Video 2 VTS_02_1.VOB at 03:30–04:15 (Sanchez acknowledges that A. is going to her mother's house); Taylor Video VTS_01_1.VOB at 04:25–04:45 (same).  Sanchez does not produce evidence supporting her allegations.  The State Defendants are entitled to summary judgment on this claim.

### (b)  Perjury by Defendants Ellerbee and Rash

In the amended complaint, Sanchez alleges she told Ellerbee that she had shown Rash evidence that A. was not in imminent danger.  Sanchez also alleges

she offered evidence undermining her adult foster child's credibility and disagreed
with much of the information supporting Rash's removal of A.  Sanchez contends
that Ellerbee and Rash "snarkeled with each other with their lips puckered as if
they had a big secret," Am. Compl. (Doc. 83-1) at 18, and, as the Court
understands it, did not believe anything Sanchez said.  When Rash completed an
affidavit for the prosecutor to file, she did not report Sanchez's refutations in the
conference, *see, e.g.*, *id*. at 18–19, and did not accurately represent everything she
saw and heard at Sanchez's home, *see, e.g.*, *id*. at 7–12.  Sanchez accuses Rash of
making false or materially incomplete statements in the affidavit, *id*. at 23–26, and
claims Rash and Ellerbee "committed perjury on multiple occasions," *id*. at 23.

Rash has submitted evidence that she reported her observations truthfully.
*See* Rash Decl. (Doc. 147) at 1; *see also* Rash State Aff. (Doc. 147-2) at 1–12.
Sanchez has not produced evidence showing that a material statement of fact in
Rash's affidavit was false or incomplete, much less that Rash knew it to be so.[6]

---

[6] In the Ninth Circuit, social workers "are not entitled to absolute immunity from claims
that they fabricated evidence during an investigation or made false statements in a dependency
petition affidavit that they signed under penalty of perjury, because such actions aren't similar to
discretionary decisions about whether to prosecute." *Beltran v. Santa Clara County*, 514 F.3d
906, 908 (9th Cir. 2008) (en banc) (per curiam) (overruling *Doe v. Lebbos*, 348 F.3d 820, 825–26
(9th Cir. 2003)).  They are entitled to *qualified* immunity for these actions. *See id*. at 908–09 .
Citing *Beltran*, the State Defendants appear to assert absolute immunity.  *See* State Defs. Br.
(Doc. 141) at 30.  On the contrary, Rash would be liable if she could not reasonably believe that
her affidavit was truthful and materially complete.  But, as Sanchez has not shown that anything
Rash said was actually false or materially incomplete, Rash need not resort even to qualified
immunity.  Sanchez fails to support the alleged constitutional violation.

Sanchez appears to contend only that Ellerbee said things to Sanchez that were not true, not that Ellerbee said anything untrue under penalty of perjury.  At any rate, Sanchez has not produced evidence, or even clear allegations, that Rash and Ellerbee committed perjury at any time.  On the first prong of the qualified immunity test, Sanchez fails to demonstrate a genuine issue of material fact.  As Sanchez does not have evidence showing a constitutional violation, Rash and Ellerbee are entitled to summary judgment.

### (c) Alcohol and Drug Tests at Visitation Site

In the amended complaint, Sanchez alleges that, on September 8, 2017, she was scheduled to visit A.  She waited for about 30 minutes.  Rash appeared and told her that someone had noticed alcohol on Sanchez's breath, so Rash would require her to "do an alcohol test before seeing her son since she might be drunk." Am. Compl. at 21.[7]  Sanchez claims Rash "chuckled" at the manner in which the oral testing device was administered, *see* Am. Compl. at 21, and objects to the test's being conducted in a "fully public location in the [Child Protective Services] office," "as if to humiliate Plaintiff and entrap her," *id*.  She also claims Rash "had

---

[7]  In her amended complaint, filed November 8, 2019, Sanchez alleges that "Defendant Friedel" arrived to administer the test.  *See* Am. Compl. at 21, 23.  In context, this person would appear to be Chris Friedel.  In another case filed in this Court, however, Sanchez filed a "Declaration Affidavit" on December 20, 2019, stating that Neil Friedel administered the test. *See* Sanchez Aff. (Doc. 48-6) at 12–13, *Sanchez v. Friedel, LLC*, No. CV 18-91-BLG-SPW-TJC (D. Mont. filed Dec. 20, 2019).

not just asked for an alcohol test but a test for all substances, thus had lied to get a drug test." *Id*.

In another case filed in this Court,[8] Sanchez submitted evidence showing that this test was administered on September 14, 2017. *See* Pl. Exhs. (Doc. 48-2) at 6, 7; Sanchez Aff. (Doc. 48-6) at 12–13, *Sanchez v. Friedel, LLC*, No. CV 18-91-BLG-SPW-TJC (D. Mont. filed Dec. 20, 2019). The evidence submitted in this case shows that, on September 11, 2017, a District Court judge of the State of Montana authorized the Department to require Sanchez to "obtain chemical dependency evaluations and submit to drug testing through random testing." State Court Order to Show Cause (Doc. 140-4) at 4 ¶ 8(f). With or without a reason, Rash was authorized to require Sanchez to undergo a drug test. The Court sees no constitutional support for distinguishing drug from alcohol tests.

As for the manner in which the test was conducted, Sanchez abandoned her allegation in *Friedel* that the test was administered in an unreasonable manner. *See* Order and Findings and Recommendation (Doc. 56) at 8, *Friedel*, No. CV 18-91-BLG (D. Mont. filed July 22, 2020) (contrasting Second Am. Compl. (Doc. 38) at 1–16 with Am. Compl. (Doc. 12-1) at 1 para. 2, 4 para. 3). And Sanchez has provided no evidence in this case to show that the test's administration was

---

[8] Courts may take judicial notice of their own records. *See, e.g.*, *Rand v. Rowland*, 154 F.3d 952, 961 (9th Cir. 1998) (en banc).

unreasonable.  The State Defendants are entitled to summary judgment on this claim.

### (d)  Timeliness of Judicial Proceedings

The amended complaint alleges that the Department did not timely file petitions with the state court and did not ensure the show-cause hearing was timely held.  *See, e.g.*, Am. Compl. at 18, 21, 27–28, 36.

Despite parents' Fourteenth Amendment liberty interest in their children's care, custody, and control, "officials may interfere with the right [provided] they 'provide the parents with fundamentally fair procedures.'"  *Keates*, 883 F.3d at 1236 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)).  In Montana, indigent parents are entitled to the appointment of counsel in abuse and neglect proceedings that may culminate in termination of parental rights.  *See In re A.S.*, 2004 MT 62 ¶ 20, 87 P.3d 408, 412–13 (Mont. 2004).  Sanchez objects to the effect of the removal and state-court proceedings on her children and her relationship with them, but she has produced no evidence indicating that the State's procedures were fundamentally unfair.  The State Defendants are entitled to summary judgment on this claim.

### (e)  Remaining Allegations

The amended complaint alleges that the Department altered the form of drug testing required by the state court and compelled her to use Friedel LLC; obtained

emergency assistance funding but did not provide the funds to Sanchez; disclosed Sanchez's name to Friedel without her permission and disclosed other confidential information; did not provide adequate visitation, unreasonably required examinations and parenting classes requiring significant outlay of Sanchez's funds and time; did not adequately communicate with her; required her to continue supporting her children financially but deprived her of funding and food stamps; did not attempt to avoid removal; did not attempt to return the children sooner with an acceptable treatment plan; and generally behaved disrespectfully toward her. *See, e.g.*, Am. Compl. at 23–26, 30, 32–44.

The State Defendants gave adequate notice that they sought summary judgment on all these allegations, *see* State Defs. Ex. A (Doc. 141-1) at 1–2, and presented evidence that the allegations are unfounded as a matter of fact, or of law, or both. *See, e.g.*, Anthony Decl. (Doc. 142) at 2–3 ¶ 2–6; Weber Decl. (Doc. 148) at 2–7 ¶¶ 2–18. Sanchez has not produced evidence supporting her allegations. The State Defendants are entitled to summary judgment.

## C. Conclusion: Qualified Immunity

Sanchez has not shown that a genuine issue of material fact exists as to any of her claims. Defendants have shown they are entitled to judgment in their favor. Summary judgment should be entered accordingly.

34

## IV. Yellowstone County and Sheriff Linder

Sanchez claims that Yellowstone County and Sheriff Linder are liable because they failed to train deputies to "know what [imm]inent danger is" and "always allowed the social worker to do removals with no warrants."  Am. Compl. (Doc. 83-1) at 13–17, 51.  These allegations are not governed by the same legal analysis as Sanchez's claims against the other defendants, because the County and Linder in his official capacity are not protected by qualified immunity.[9]  *See Brandon v. Holt*, 469 U.S. 464, 473 (1985); *Owen v. City of Independence*, 445 U.S. 622, 638 (1980).

"Congress did not intend municipalities to be held liable [under 42 U.S.C. § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  A county or city is not liable for acts of its employees in the way other employers generally are liable for employees' acts—or, in other words, there is no *respondeat superior* liability under § 1983.  "The 'official policy' requirement [is] intended to distinguish acts of the *municipality* from acts of *employees* of the

---

[9]  Linder could be liable in his individual capacity as an officer in a supervisory role responsible for training.  In that capacity, he could seek qualified immunity.  In his official capacity, he cannot.  *See, e.g.*, *Community House, Inc. v. City of Boise*, 623 F.3d 945, 966 (9th Cir. 2010).  But, for present purposes, the Court will disregard the distinction and address the claims against Sheriff Linder and Yellowstone County together.  The question is whether the record contains evidence that could support a jury's finding in favor of Sanchez and against the County or Linder in his official capacity.  That question is the same as the first prong of the qualified immunity test, i.e., whether Sanchez can prove a violation of her constitutional rights.

municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original).  A municipal entity "is not liable under § 1983 unless a municipal policy *causes* a constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (emphasis added).

The County asserts that it has a policy or practice of relying on social workers' representations and assisting in removing children from parental custody in emergency situations.  *See* County Br. (Doc. 120) at 7–8; Linder Aff. (Doc. 125) at 2 ¶ 2.  The County also asserts it has a policy or practice of entering private homes without a warrant only "when there is consent of the owner, a court order or an emergency that threatens serious harm to someone in the house."  County Br. at 8; Linder Aff. at 2 ¶ 3.

Under the circumstances presented by this case, these policies did not cause a violation of Sanchez's constitutional rights.  As explained above, Rash's identity was known to the officers.  She could have been held accountable if she misled them.  Sanchez alleges that "no attempt was made [by Yellowstone County deputies] to verify that the removal was appropriate or legal," Am. Compl. at 16, but the law does not require officers to obtain independent evidence corroborating a known complaining witness's statements, *see, e.g.*, *Gates*, 462 U.S. at 233–34; *Williams*, 407 U.S. at 146–47.  Sanchez adduces no evidence (and makes no

36

allegation) that a deputy knew Rash to be acting in bad faith but assisted the removal pursuant to County policy or based on his training. Consequently, Sanchez cannot show the County's policies caused a violation of her constitutional rights. Yellowstone County and Linder, in both his individual and official capacities, are entitled to summary judgment.

## V. Friedels and Bullock

The amended complaint purports to name as defendants Rich, Douglas, and Neil Friedel as well as then-Governor Steve Bullock. *See* Am. Compl. at 1 (caption). Sanchez did not ask that these defendants be served, and none has been served or appeared in this action. Notably, the amended complaint, filed on November 8, 2019, repeated essentially the same allegations against these defendants that Sanchez was already pursuing in other actions. *See Sanchez v. Bullock*, No. CV 18-90-BLG-SPW-TJC (D. Mont. filed June 4, 2018); *Sanchez v. Friedel, LLC, et al.*, No. CV 18-91-BLG-SPW-TJC (D. Mont. filed June 4, 2018). Unless she shows the District Court good cause to extend time for service, *see* Fed. R. Civ. P. 4(m), these defendants should be dismissed.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. The District Court should GRANT the motion for summary judgment filed by Defendant Chris Friedel (Doc. 109).

37

2. The District Court should GRANT the motions for summary judgment filed by Defendants Friedel, Cunningham, Lauwers, Linder, McCave, Taylor, and Yellowstone County (Docs. 119, 127, 129, 131, 133, 135).

3. The District Court should GRANT the motion for summary judgment filed by Defendants Anthony, Ellerbee, Fitch, Hogan, Johnson, Kirby, Larson, and Rash, and Weber (Doc. 116).

4. Defendants Neil Friedel, Rich Friedel, Douglas Friedel, and Steve Bullock should be DISMISSED.

5. All claims having been addressed, the clerk should be directed to enter, by separate document, judgment in favor of all Defendants and against Plaintiff.

6. Because Sanchez fails to prove the existence of a clearly established right and/or fails to provide any evidence supporting her allegations, the District Court should CERTIFY, pursuant to Federal Rule of Appellate Procedure 24(a)(3)(A), that any appeal from its disposition would not be taken in good faith.

### NOTICE OF RIGHT TO OBJECT
### TO FINDINGS & RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may object to the Findings and Recommendations within 14 days. *See* 28 U.S.C. § 636(b)(1).[10]  Failure to timely file written objections may

---

[10]  This deadline allows a party to act within 14 days after the Findings and Recommendation is "served."  Federal Rule of Civil Procedure 6(d) allows three additional days after the period would otherwise expire.

bar a de novo determination by the district judge and/or waive the right to appeal.

DATED this 1st day of March, 2021.

_/s/ Timothy J. Cavan_
Timothy J. Cavan
United States Magistrate Judge